**KOHL v. WILMS.**
**Patent Appeal No. 5536.**

United States Court of Customs and Patent Appeals.
June 28, 1949.

J. Harold Kilcoyne, Washington, D. C. (John Mahoney, East Pittsburgh, Pa., of counsel), for appellant.

Carl T. Mack, Washington, D. C. (David A. Fox, Milwaukee, Wis., of counsel), for appellee.

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL and JOHNSON, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office in an interference proceeding embracing ten counts, priority upon all of which was awarded to the party Wilms.

A general description of the invention is given in the brief for Wilms as follows:

"The subject matter involved in this interference, as defined by the counts, is an electrical snap switch, so constructed as to separate its electrical contacts without a transition condition of vanishing contact pressure, no matter how slowly the switch is actuated. A switch is thus provided which preserves substantial contact pressure until the instant of opening, minimizing deterioration caused by such electrical effects as arcing and welding or sticking of contacts.

"The Wilms patent from which the counts derive states:

"* * * the contact pressure Fc cannot go to zero under equilibrium conditions prior to reversal of the switch."

"It is to be noted that one advantage of this invention is that flexible spring 3 during preliminary stages of actuation stores up energy which is later effective to operate the switch." * * *

"The desired result is accomplished in the structures defined by the counts by causing a resilient member to bow in a particular fashion to build up force necessary to snap a compressible toggle spring from one side to the other of the toggle axis. This bowing action is set up in such direction as to cause a storage of energy which is given out prior to and as the moving parts cross the toggle axis thus eliminating the possibility of the existence of a dead center or critical position for the parts. It is this which insures retention of substantial contact pressure, in the switch up to the moment of snapping regardless of how slowly the switch may be actuated."

It was the view of the board (and there does not appear to be any disagreement with this finding) that counts 3, 5, 7, and 9 are sufficiently illustrative of all the counts involved. These read:

"3. In an electrical switch having a stationary contact and a movable contact engageable therewith, means for actuating the movable contact with a snap motion into and out of engagement with the stationary contact, comprising a pair of flat spring members, both rigidly mounted at one end in edgewise side by side relation, one member of which is longer than the other, the longer member carrying the movable contact, and an expansion spring confined between opposing adjacent end portions of said members to yieldingly urge the same apart, so that the combined spring action of the shorter spring member and the expansion spring at all times yieldingly urges the longer spring member toward one side or the other of a plane coinciding with the common plane of the end mounting of said members, and an actuator applied to the shorter spring member in-

termediate its ends to deflect said shorter spring member.

"5. In a snap action switch, the combination comprising a contact carrier composed of flat spring material, mounted to be deflected to and from a contact, and having a free end and a rigidly mounted end, an endwise compressible resilient expansion member engaging said carrier at a point remote from the rigid mounting thereof, a laterally deflectable member composed of flat spring material rigidly mounted near the rigid mounting of said carrier, and having a free end engaging the end of said resilient expansion member opposite the end thereof engaged by said contact carrier, and means for acting upon said laterally deflectable member intermediate its ends to deflect and urge the same toward a line joining the rigid mounting of said laterally deflectable member and the point of engagement between said resilient expansion member and said carrier. .

"7. In an electrical switch, a combined mounting and actuating member for a movable contact, comprising a flat spring blade having a substantially U-shaped cut-out therein so as to provide substantially two independent spring blades, one longer than the other with the shorter blade disposed within the longer, the longer blade carrying the movable contact adjacent to its portion defining the closed end of the U-shaped cut-out, and an expansion spring having one of its ends seated on the longer blade and the other of its ends seated on the shorter blade, whereby said arms are biased with respect to each other and an actuator applied to said shorter blade intermediate its ends.

"9. A snap acting control mechanism comprising in combination, a first member having a free end movable in a fixed path between two positions, an actuating means having a free end movable in a fixed path between two positions, and a resilient expansion member spaced between an engaging the said two free ends to form a resilient connection therewith having an axis of maximum stress, said first member and said actuating means arranged to allow said expansion member to move to alternate positions of reduced stress with snap action, and said actuating means including a resilient member and an actuator, said latter resilient member to be intermediate the actuator and the free end of said actuating means and arranged to be deflected in a direction across the said axis of maximum stress, whereby, upon motion of the actuator energy is stored in the latter resilient member to initiate snap action in said expansion member from one position to the alternate position before the movable end of the actuating means reaches said axis of maximum stress."

The record before us is an elaborate one covering some 1200 printed pages, including numerous documentary exhibits. There are also a number of physical exhibits consisting of specimens of switches. Both parties took extensive testimony and were represented in oral argument, as well as by briefs, before the different tribunals of the Patent Office in all the proceedings there had following the declaration of the interference. The controversy obviously has been quite spirited. Rehearings of practically all the decisions of the Primary Examiner, as well as that of the board, were sought and granted to the extent of writing additional opinions. Clearly, all phases of the case received very full consideration by the tribunals of the Patent Office.

In taking the appeal to this court the party Kohl, in his reasons of appeal, set forth 53 allegations of error. The brief on his behalf before us contains 122 printed pages and that of the party Wilms contains 46 pages.

From the foregoing it will be obvious that it has been necessary for us to expend much time and care in studying the record and the contentions made.

It may be said at the outset, however, that no serious question of law is in controversy. The brief for the party Kohl, notwithstanding the large number of errors assigned in the reasons of appeal, states:

"The issues to be decided in the interference are as follows:

"1. The party upon whom the Burden of Proof is to be placed.

"2. Whether switch Wilms' Exhibit 2 constitutes an abandoned experiment.

"3. Whether the concealment and suppression of switch Wilms' Exhibit 2 estops him to assert that he is the inventor of Counts 1 to 10 of the interference.

"4. Priority of invention."

The brief for the party Wilms comments upon the Kohl statement of the issues as follows:

"The first issues attempted to be set up, poses a question as to the burden of proof. No action of the Board of Interference Examiners with reference to this subject was assigned as error on the appeal. The Board, in fact, as its decision shows * * *, determined the matter on the basis of simple preponderance of the evidence, on the basis of which Wilms was held entitled to prevail. There is no such delicately balanced question of who should prevail in the case as to render 'burden of proof' of any significance whatever.

"The second issue attempted to be set up, is a challenge of Wilms' 1934 reduction to practice as an abandoned experiment. Errors 38, 39 and 51 * * * probably are here referred to.

"The third issue attempted to be set up by the party Kohl is but a repetition of the second, and the fourth is nothing other than the general issue of 'priority'.

"It is therefore difficult to tell whether the party Kohl seeks to reverse the Board of Interference Examiners in its holding that the Kohl prior issued patent fails to support the counts. It is equally difficult to ascertain whether the party Kohl seeks to reverse the Board of Interference Examiners in its holding that none of the proofs of Kohl as to Physical Exhibits A, M, N, P, and Q support the counts.

"The bulk of the brief of Kohl, however, is devoted to an argument that the prior Kohl patent and the proofs of early activities on the part of Kohl support the counts. The correctness of the decision of the Board of Interference Examiners on these points is therefore assumed to be challenged."

The foregoing statements from the respective briefs seem to us fairly to define the ultimate issues of the case. So, the questions are solely questions of fact upon each of which the board passed in its original decision rendered April 10, 1947, and again, to the extent necessary, in its decision of May 16, 1947, rendered in response to the request of the party Kohl for reconsideration.

While, in view of the fact that the reasons of appeal do not raise any question before us respecting the burden of proof, we do not feel called upon to review that matter, it is deemed proper to quote the following from the board's decision as a part of the history of the case:

"The interference was declared between the Kohl continuation-in-part application Serial No. 383,436, filed March 14, 1941, and the Wilms patent which was filed on October 19, 1938, as application Serial No. 235,760, which ripened into patent No. 2,260,964 on October 28, 1941. Since Kohl was given the benefit of his earlier filed application Serial No. 214,923, filed June 21, 1938, now patent No. 2,237,705, he was made senior party as the interference was originally set up.

"The counts here in issue originated in the Wilms patent. Kohl copied the claims in his pending application and requested an interference. The Primary Examiner instituted the interference without rejecting the claims to Kohl. During the motion period the party Wilms brought a motion to dissolve and also a motion to shift the burden of proof contending that the earlier filed Kohl application (now patent) would not support any of the counts here in issue.

"The Primary Examiner was of the opinion that Wilms admitted in his motion to dissolve that the disclosure in certain modifications of the pending Kohl application would support the counts in issue as a consequence, the motion was denied forthwith.

"The Primary Examiner granted the motion to shift as to counts 1 to 7, inclusive, but denied it as to counts 8, 9 and 10. Kohl requested reconsideration of the decision with respect to counts 1 to 7 and Wilms requested reconsideration with respect to counts 8, 9 and 10. Without considering it necessary to consider Kohl's request for reconsideration the Primary Examiner reconsidered his previous decision and, with

the exception of correcting some errors, adhered to his original position. On page 6 of Kohl's brief appears:

"Since the question upon whom the burden of proof is to be placed may, under Rule 122, be reviewed at Final Hearing, the Board of Interference Examiners is respectfully requested to review this question of priority and to place the burden of proof of all the counts upon Wilms."

"Although the party Wilms has not definitely requested that the question upon whom the burden of proof falls be reviewed, under Rule 122, at final hearing nevertheless he contends * * * that the Primary Examiner was in error in holding that counts 8, 9 and 10 are supported by the Kohl structure illustrated in Figures 11 and 12 of his patent.

"Accordingly, both decisions * * * of the Primary Examiner will be reviewed.

It is to be seen, from the board's review of the Primary Examiner's ruling that it was not only concluded that the burden of proof was correctly shifted from Wilms to Kohl as to counts 1 to 7, inclusive, but that it should have been so shifted as to counts 8, 9, and 10 also, because the board found that counts 8, 9, and 10 were not supported by Kohl's early application, filed June 21, 1938, which matured into patent 2,237,705.

■ So, as the case stands before us, Kohl must be regarded as the junior party as to all the involved counts with the burden of establishing priority by a preponderance of the evidence.

It was found below that a switch constructed in conformity with the description and drawings of the Wilms patent was made and tested in July 1934. The switch was produced and placed in evidence as Wilms' Exhibit 2. We find no claim on the part of Kohl that the description and drawings do not disclose a complete embodiment of the material features of all ten of the counts, nor do we find any claim that Wilms' testimony relative to this phase of the case is lacking in full corroboration.

A further finding of the board reads: "The testimony in behalf of Wilms also cleary shows that a Wilms switch was sold to the A. C. Spark Plug Division of General Motors, Flint, Michigan, in November 1937; and, one to the York Ice Machinery Corp., York, Pennsylvania in February of 1938. The latter was unquestionably a public use. Both of these dates are more than two years prior to the date March 14, 1941, the date of filing of the Kohl application herein involved and are a bar to the granting of a patent on any common subject matter in said application.

It is noted that the dates of both the so recited sales are prior to the filing date of Kohl's early application, serial No. 214,923 (now patent 2,237,705), on June 21, 1938. (It is also noted from the testimony that several sales not referred to by the board apparently were made to others during 1937 and 1938).

■ We are not convinced that the board erred in according reduction to practice to the party Wilms "not later than July 1934," nor do we think, in view of the course shown to have been pursued by him, that there is sound basis for the contention that his product then reduced to practice was an abandoned experiment. We find no merit in the suggestion that the party Wilms suppressed and concealed his invention. This suggestion, in fact, has not been stressed before us.

■ It is obvious that in order for the party Kohl to prevail it must be found that he reduced to practice the invention, defined in all the counts, prior to "not later than July 1934."

The description and drawings in the application of the party Kohl, serial No. 214,923, filed June 21, 1938, (which was the basis of his patent No. 2,237,705) have been carefully studied, in the light of the extensive brief and the oral argument before us on his behalf. The several physical exhibits—the switches—also have been examined.

The Board of Interference Examiners, in its opinion stating the reasons for its decision, discussed and described in detail every pertinent feature of the invention. No useful purpose would be served by repeating or paraphrasing that part of its decision.

The switch in evidence as Kohl's physical Exhibit A, conceived and reduced to practice in 1932, does not support the counts in issue, nor does the switch in evidence as Kohl's physical Exhibit M, conceived and reduced to practice in 1933, support them. Such of Kohl's switches as might be held to support the counts were conceived and reduced to practice subsequent to the date properly accorded the party Wilms for conception and reduction to practice—that is, "not later than July 1934."

The decision of the Board of Interference Examiners is affirmed.

Affirmed

HATFIELD, Judge, was present at the argument of this case, but, by reason of illness, did not participate in the decision.